IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

_____

No. CIV 10-934 BB/SMV

IN THE MATTER OF THE CASWELL SILVER FAMILY
TRUST CREATED UNDER THE TERMS OF THE
CASWELL SILVER REVOCABLE TRUST U/A DATED
NOVEMBER 21, 1985, AS AMENDED, THE CASWELL
SILVER MARITAL TRUST CREATED UNDER THE
TERMS OF THE CASWELL SILVER REVOCABLE
TRUST U/A DATED NOVEMBER 21, 1985, AS
AMENDED, THE CASWELL SILVER MARITAL GST
EXEMPT TRUST CREATED UNDER THE TERMS OF
THE CASWELL SILVER REVOCABLE TRUST U/A
DATED NOVEMBER 21, 1985, AS AMENDED, THE
ELIZABETH B. SILVER TRUST U/A DATED JUNE 26,
1989 , THE ELIZABETH B. SILVER OIL TRUST U/A
DATED DECEMBER 28, 1989 AND THE ELIZABETH B.
SILVER INSURANCE TRUST U/A DATED DECEMBER
30, 1993.

MEMORANDUM OPINION
INCLUDING
FINDINGS OF FACT
AND CONCLUSIONS OF LAW

THIS MATTER came on for a bench trial on July 23 and 24, 2012, and having

adduced all the evidence, considered the closing arguments, memoranda of law, and

proposed findings of fact and conclusions of law submitted by the parties, and being

fully advised in the premises, the following opinion will constitute the Court's Findings

of Fact and Conclusions of Law.

## Background

Caswell Silver and Elizabeth B. Silver were married and had two children; namely Anne H. Silver and Sue S. Harivandi. Anne Silver has one child, Caswell Rico-Silver. Sue Harivandi has two children, Zsaleh Elizabeth Harivandi and Mithra Ariel Harivandi. Ms. Silver, Ms. Harivandi, Caswell Rico-Silver, Zsaleh Elizabeth Harivandi and Mithra Ariel Harivandi are collectively referred to as the Beneficiaries or Respondents.

On November 21, 1985, Caswell Silver signed a trust agreement under which Caswell Silver created a trust known as the Caswell Silver Revocable Trust (CSRT), which Caswell Silver amended on May 28, 1988. Under Article 1-5.1 of the CSRT Agreement, as amended, upon the death of Caswell Silver three trusts were created from the residuary trust estate; specifically: 1) the Caswell Silver Family Trust; 2) the Caswell Silver Marital Trust; and 3) the GST Exempt Marital Trust. Caswell Silver died on October 18, 1988.

Elizabeth B. Silver signed a trust agreement on June 26, 1989, under which Elizabeth B. Silver created a trust known as the Elizabeth B. Silver Trust. (EBS-1 Trust). On December 28, 1989, Elizabeth B. Silver signed a trust agreement under which Elizabeth B. Silver created a trust known as the Elizabeth B. Silver Oil Trust.

Robert Allen Rikoon and Lawrence Steven Taub (collectively Petitioners) agreed to serve as Co-Trustees of the Caswell Silver and Elizabeth B. Silver Trusts. Rikoon and Taub and each of the Beneficiaries signed a Memorandum of Fee Agreement dated

May 20, 1993. Petitioners assumed the office of Co-Trustees of the Silver Family Group of Trusts upon the request of Elizabeth B. Silver, following the removal of the predecessor trustee, James D. Hanegan, in June 1993. Thereafter, Elizabeth B. Silver signed a trust agreement under which Elizabeth B. Silver funded life insurance and created a trust known as the Elizabeth B. Silver Life Insurance Trust (EBSLIT). Petitioners were then the duly appointed and acting Co-Trustees of the Silver Family Group of Trusts and the EBSLIT.

During the time Petitioners served as Co-Trustees of the Trusts, Petitioners also provided services as business and financial managers, including estate planning services, for Elizabeth B. Silver.  Petitioners submitted quarterly accountings and reported to Respondents after assuming the office of Co-Trustees of the Trusts in 1993 and basically delineated the nature of the services and for whom they were provided. Respondents approved each of the quarterly deposits and billings submitted by Petitioners, often following a substantial dialogue.

Elizabeth B. Silver died on July 3, 2009 and was survived by her two adult children, Ms. Silver and Ms. Harivandi, as well as by three adult grandchildren, Caswell Rico Silver (child of Anne Silver), and Zsaleh Elizabeth Harivandi and Mithra Ariel Harivandi (children of Sue Silver Harivandi).  The Respondents, Anne and Sue, were named personal representatives of Elizabeth's Estate and co-trustees of the Elizabeth B. Silver Trust No. 2 (EBS No. 2). The EBS No. 2 is a revocable trust which

was created by Elizabeth B. Silver and for which she acted as Trustee during her lifetime, and which became irrevocable upon her death.

Prior to the filing of this proceeding, Petitioners and Respondents, and their respective attorneys, were involved in negotiations to implement an orderly distribution and termination of all the Silver Family Group of Trusts. In response to Respondents' June 16, 2010, request for an immediate 100% distribution, the Trustees offered to distribute 90% of the assets by June 30, 2010, with 10% to be held back until "such time as the release documents are prepared, approved and executed, provision for final tax returns is made and the inventory and transfer of files is established...." Respondents Ms. Silver and Ms. Harivandi, by and through their legal counsel, were unwilling to accept anything but an immediate 100% distribution without providing any explanation of the necessity therefor.

Each and every quarterly accounting and report provided by the Co-Trustees, including quarterly billing statements, to the beneficiaries of the Trusts through March 31, 2010, had been approved by Respondents prior to filing of this proceeding. Respondents would not, however, approve Petitioners' quarterly accountings and reports following March 31, 2010, nor would Respondents approve Petitioners traditional and customary fees for such period.

By letter dated June 16, 2010, Ms. Harivandi and Ms. Silver requested, among other things, that Petitioners deliver all assets and cash in the Trusts to designated accounts no later than June 30, 2010. Respondents further informed Petitioners that

4

once the assets had been transferred, Petitioners' fees based upon a percentage of assets would end, and that as of July 1, 2010, the Beneficiaries would pay only reasonable fees associated with winding up the Trusts.  Further, Ms. Silver and Ms. Harivandi, by and through their New Mexico legal counsel, stated that, as the duly appointed and acting Co-Trustees of the EBS No. 2 Trust, they would seek judicial approval and/or modify the terms of the CSGST Exemption Trust.

There was an impasse in the negotiations to distribute and terminate the Trusts. Petitioners filed this lawsuit on September 3, 2010.  Petitioners sought legal guidance, instructions, and approval from the Court before making any further distributions or terminations of The Silver Family Group of Trusts.  As of the date the Trustees filed their state court Petition, the Estate taxes had been paid, but the Internal Revenue Service had not yet issued a closing letter.  All trust accountings submitted to the Beneficiaries for approval had been approved, except for the second quarter 2010 accounting.

Respondents removed the case to this Court based on diversity. This Court mandated a pre-trial mediation conference.  Following a settlement conference before the Honorable Carmen Garza held on February 22, 2011, Petitioners agreed to distribute all but $216,000 of the remaining assets of the six Trusts, which Petitioners had previously transferred into an account identified as a Uniform Trust Code (UTC) Reserve Fund, pending further order of the Court or agreement of the parties. Petitioners agreed to cut their fees in half, to $60,000, which was to be paid from the

$216,000 UTC Fund.  Contrary to the partial settlement reached on February 22, 2011, however, Respondents refused to pay Trustees $1,500 for their review and execution of the Estate tax returns.

By order entered January 5, 2102, this Court denied the Respondents' motion to amend their Answer to assert a counterclaim for professional negligence against Petitioners.  In July 2012, Respondents petitioned this Court for attorneys' fees pursuant to § 46A-10-1004 and reserved the right to file a specific amount under Rule 54(d) of the RULES OF CIVIL PROCEDURE.  Finding little prejudice to Respondents by requiring them to file a new lawsuit, rather than litigating their proposed new counterclaim in this action, this Court denied the motion to amend.

The parties stipulated at the settlement conference the only issues remaining to be resolved following the partial settlement were: (1) whether Trustees are entitled to a release of claims, and if so what should be the breadth of such a release; and (2) whether Trustees are entitled to use trust assets to pay the attorneys' fees they have incurred in attempting to seek judicial oversight to obtain the releases of claims and in filing and litigating the instant lawsuit.  Resolution of these questions depends on the facts developed at trial.  Mary F. Radford, George Gleason Bogert, George Taylor Bogert, BOGERT'S TRUSTS AND ESTATES § 1010 (2011).  They will be discussed in reverse order.

A.      <u>Delayed Distribution</u>

By Notice of Removal of Co-Trustee dated September 14, 2009, each of Respondents gave notice to Petitioners that Petitioners were removed as Co-Trustees of the CSGST effective thirty days from the date of the Notice.  However, no name or address of a successor trustee was ever given Petitioners. Nor do Respondents claim that any money was lost because of an alleged delay in transfer of any Trust assets. Moreover, during the relevant period, Ms. Silver and Ms. Harivandi continued to have the same input into investment decisions as they had since the appointment of Petitioners in June 1993.

The need for some type of legal protection for the Trustees was created by (1) their removal as trustees for the CSGST; (2) Respondents failure to approve their quarterly accountings and fees in March 2010; (3) the refusal to even consider a carve out of issues in dispute much less indemnity for any claims of the grandchildren; (4) outstanding tax issues on two of the Trusts.  Although Petitioners made several offers to resolve this dispute, Respondents refused to consider any resolution short of an immediate 100% distribution of all trust funds.  From July 2009 to the present Respondents have not proposed any form of a release or a judicial discharge of Petitioners with or without carve outs or indemnity.

Like the Uniform Probate Code in general the New Mexico version encourages the amicable settlement of trusts outside of court.  David M. English, *The New Mexico Uniform Trust Code*, 34 N.M. L. Rev. 1, 14 (2004).  If, however, there is a potential

conflict of interest between beneficiaries and only one approves, or if other legal issues arise during administration or termination of a trust, the trustees should seek judicial approval. *Ibid.* 15-16.

The duties of a trustee are determined by terms of the trust, by statute, and by common law. *Crutcher v. Joyce*, 134 F.2d 809, 811 (10th Cir. 1943); *In re Estate of Ehlers*, 911 P.2d 1017, 1021 (Wash. Ct. App. 1996). Respondents have not identified any language in any of the Trusts which requires a full and immediate distribution under any and all circumstances. Respondents failure to discuss maintenance of any provisional reserve under the present circumstances was both unreasonable and unsupported by law.

The Court has also examined the relevant sections of New Mexico's version of the Uniform Trust Code, 46A-1-101 *et seq.* NMSA (2007). The Uniform Trust Code specifically allows a trustee to withhold a portion of the trust estate for a reasonable time for the payment of debts, taxes and expenses. Specifically, under § 46A-8-817(b), "Upon the occurrence of an event terminating the trust property the trustee shall proceed expeditiously to distribute the trust property to the persons entitled to it, <u>subject to the right of the trustee to retain a reasonable reserve for the payment of debts, expenses and taxes</u>." (Emphasis added). *See also* Mary F. Radford, George Gleason Bogert, George Taylor Bogert, BOGERT'S LAW OF TRUSTS AND TRUSTEES § 1010 (2011); RESTATEMENT (THIRD) OF TRUSTS § 38 Comment (b) (2003) (trustee may

reserve for reimbursements prior to distribution).  This is also consistent with the common law.[1]

Petitioners had a right to retain a reasonable reserve for the payment of debts, expenses and taxes of the six Trusts.  Petitioners were entitled to use trust assets to pay the attorneys' fees and expenses they incurred in this litigation and attempting to settle the disputes in this litigation.

B.    The Release

Prior to the filing of this proceeding, Petitioners proposed that the same form of receipt and release document which the Respondents approved and signed as beneficiaries when James D. Hanegan was removed as Trustee. Ms. Silver and Ms. Harivandi were unwilling to accept any form of receipt and release documents.

"It is legal duress for a trustee to refuse to turn over property to his beneficiary rightfully entitled thereto, except upon condition of signing a release." *Ingram v. Lewis*, 37 F.2d 259, 263 (10th Cir. 1930).  If this Court had found Ms. Silver and Ms. Harivandi were "rightfully" entitled to an immediate distribution of all Trust assets upon the death of Elizabeth Silver, this rule would decide the matter.  However, as noted before, Respondents demanded immediate distribution while legal and tax questions were still outstanding.  Petitioners offered to distribute 90% of the Trusts'

---

[1]       *See, e.g., Continental Ill. Nat'l Bank & Trust Co. of Chicago v. Roan*, 617 F.2d 1217, 1223 (7th Cir. 1980); *Wilbanks v. Gray*, 795 So.2d 541, 549 (Miss. App. 2001); *First Union Nat'l Bank v. Jones*, 768 So.2d 1213, 1214 (Fla. App. 2000); *Matter of Estate of Holscher*, 724 S.W.2d 577, 582 (Mo. App. 1986); *United States Trust Co. v. Bohart*, 495 A.2d 1034, 1044 (Conn. 1985).

estates but withhold 10% for contingencies.[2]  Petitioners also sought to reserve or carve out their liabilities for certain contingencies.  Finally, Petitioners offered to arbitrate any disputes Respondents may have been harboring.[3]  Respondents stood on their demand for an immediate 100% distribution and refused to even discuss indemnifying or releasing Petitioners on any terms.  After various attempts to resolve the matter without resort to the courts, Petitioners filed this action in New Mexico state court.  Having identified no issues in dispute, Respondents nonetheless contested Petitioners request for a court order "determining the amount and timing of final distribution of assets ... approving the payment of all final expenses ... [and] declaring that Petitioners have no further obligations and/or responsibilities associated with their role as Co-Trustees."  (N.M. state Pet. 11).  Indeed, Respondents removed the state court dispute to this Court and sought attorneys' fees.

A similar dispute was considered in *First Midwest Bank/Joliet v. Dempsey*, 509 N.E.2d 791 (Ill. App. 1987).  In that case, Sally Dempsey was the beneficiary of a testamentary trust established by her grandfather.  After receiving one-half of the trust distribution, Sally agreed to invest heavily in a family Real Estate Venture.  Sally also authorized the Bank to place her trust shares under the control of the family members directing the Venture.  The Bank also loaned the Venture money, secured by the real

---

[2]      Numerous forms of Releases have been suggested by members of the American Bar Association.  *See, e.g.*, Robert Whitman, *Sorting Out Receipts and Releases*, SN003 ALI-ABA 281 (2007); Nicole Jennings Wade, Matthew Pearce, *Making Waivers Work: Release Provisions and Exculpatory Clauses*, SL003 ALI-ABA 463 (2005).

[3]      *See* Bridget A. Logstrom, Bruce M. Stone, & Robert M. Goldman, *Resolving Disputes With Ease and Grace*, 31 ACTEC J. 235, 236-7 (2005) (advocating arbitration of such trust disputes).

10

estate. Sally eventually sued and recovered a judgment against her brother and sister-in-law for fraud and mismanagement of the Venture. When the Venture went bankrupt, the Bank sued to foreclose on the real estate and named Sally as potentially having an interest. She was adjudicated to have no interest, but the Bank refused to distribute the second half of her grandfather's trust until she executed a release and it sought judicial oversight of the distribution. Sally cross-claimed challenging the Bank's failure to distribute the trust. The Illinois Court of Appeals affirmed the trial court's finding of no breach of trust duties:

> Further, the trust terminated as to Sally's interest on July 6, 1983, and she was thereafter entitled to distribution of the corpus. In due course, the Bank sought distribution, presenting its accounts and asking that the beneficiary sign a receipt and release. Sally refused. The trustee's action in withholding distribution to the beneficiary after the trust had terminated was proper. One of the privileges of a trustee to help compensate for its burdens of the office (and while it still has funds available to it) is a right to a determination of the propriety of its accounts before making a final distribution. Under Illinois law, a trust continued beyond termination until it is finally wound up. The period for winding up depends upon the circumstances. *Breen v. Breen*, 103 N.E.2d 625 (Ill. 1952); Bogert, *Trust and Trustees* § 1010 (rev. 2d ed. 1983).

> We conclude that the trial court was correct in the finding that the trust made an excellent profit and there were no damages demonstrated. The failure to distribute was not willful and was within the Bank's right.

509 N.E.2d at 797.

## Costs and Attorneys' Fees

After Respondents withheld their approval of Petitioners final accounting and would not negotiate, Petitioners were forced to seek judicial intervention. A final

accounting is the reasonable duty of a trustee and the same is entitled to reasonable compensation therefor. *Templeton v. Continental Ill. Nat'l Bank & Trust Co. of Chicago*, 429 F. Supp. 1294, 1301 (N.D. Ill. 1977); *Estate of Moring v. Colorado Dep't of Health Care Policy*, 24 P.3d 642, 646 (Colo. App. 2001).  When a trustee has a good faith basis to seek judicial supervision of a trust distribution, the trust should bear the costs.[4]  This applies to attorney's fees as well. *Weidlich v. Comley*, 267 F.2d 133, 134 (2d Cir. 1959); *Allard v. Pacific Nat'l Bank*, 663 P.2d 104, 112 (Wash. 1983).  Petitioners incurred attorneys' fees and expenses in connection with the negotiations concerning the termination of the Trusts and with this proceeding.

Petitioners did not breach their fiduciary or statutory duties owed to Respondents as trustees in any respect and Respondents and the Trusts have suffered no damages. Having considered (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly, (2) the fee customarily charged in the locality for similar legal services, (3) the amount involved and the results obtained, (4) the nature and length of the professional relationship with the client, and (5) the experience, reputation, and ability of the lawyers performing the services, Petitioners' attorneys' fees and expenses were reasonable and necessary.

---

[4]   NMSA § 46A-2-201(C) (2011); *Cooper v. Brodie*, 480 S.E.2d 101, 104 (Va. 1997); *Northern Trust Co. v. Heuer*, 560 N.E.2d 961, 964 (Ill. App. 1990);  *cf. Bogle v. Bogle*, 188 P.2d 181, 183 (N.M. 1947) (no fees if litigation results from trustee's malfeasance).

Respondents listed full trustee and legal fees and expenses (through the fall of 2011) as additional deductions to the IRS auditor to the 706 estate tax return. Respondents deducted these fees but apparently failed to inform the IRS the fees were contested and remained unpaid. Moreover, Petitioners compromised their $120,000 claim for $60,000 at the Court ordered arbitration. Petitioners' legal fees and expenses (through the fall of 2011) were accepted by the IRS as allowable deductions against the decedents estate tax in December 2011.

Respondents' counterclaims for breach of fiduciary duty are unsupported. Respondents are not entitled to an award of attorneys' fees and expenses.

All tendered findings and conclusions not incorporated herein are deemed Denied.

A Judgment consistent with this opinion should be drawn up by counsel for Petitioners and presented to the Court within twenty (20) days.

DATED this 15th day of August, 2011.

_____
BRUCE D. BLACK
Chief United States District Judge